## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL E. FOSTER, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-CV-49-JAR |
| | ) | |
| CAROLYN COLVIN, | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Michael J. Foster's ("Foster") application for disability insurance benefits under Title II of the Social Security Act on March 17, 2010, alleging a disability beginning January 1, 2008. (Tr. 17.) Foster alleges disability due to back problems, feet problems, obesity, anxiety, and depression. (Tr. 62, 135.)

## I. Background

On March 17, 2010, Foster completed his application for disability insurance and SSI benefits. (Tr. 17.) The Social Security Administration ("SSA") denied Foster's application for benefits and he filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 67-68.) The SSA granted Foster's request and a hearing was held on February 1, 2012. (Tr. 17.) The ALJ issued a written decision on March 1, 2012, upholding the denial of benefits. (Tr. 17-24.) Foster requested a review of the ALJ's decision by the Appeals Council. (Tr. 13.) On January 10, 2013, the Appeals Council denied Foster's request for a review. (Tr. 7-9.) Foster

submitted additional documents to the Appeals Council, including records from St. Francis Medical Center dated April 27, 2012 through December 31, 2012. (Tr. 5.) On January 18, 2013, the Appeals Council denied Foster's request for review. (Tr. 1-3.) The decision of the ALJ thus stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000). Foster filed this appeal on March 12, 2013. (ECF No. 1.) The Commissioner filed an Answer. (ECF No. 9.) Foster filed a Brief in Support of his Complaint. (ECF No. 11). The Commissioner filed a Brief in Support of the Answer. (ECF No. 14.) Foster filed a Reply Brief in support of his Complaint. (ECF No. 15.)

## II. Decision of the ALJ

The ALJ determined that Foster met the special earnings requirement of the Act as of January 1, 2008, the alleged onset of disability, and continues to meet them through September 30, 2012. (Tr. 23.) The ALJ found that Foster had not engaged in substantial gainful activity since January 1, 2008, although he had $961 in reported earnings for 2009. (Tr. 24.) The ALJ determined that medical evidence established that Foster has obesity, degenerative disc disease of the cervical spine, and hypertension, hyperlipidemia, anxiety and depression controlled by medication, but no impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in Appendix 1, Subpart P, Regulations No. 4. (Id.) The ALJ found that Foster's allegation of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity is not credible. (Id.) The ALJ found that Foster had the residual functional capacity ("RFC") to perform the physical exertional and nonexertional requirements of work, except probably for lifting or carrying more than 30-40 pounds frequently. The ALJ found no credible, medically-established mental or other nonexertional limitations (Id. (citing 20

C.F.R. 404.1545))   The ALJ also determined that Foster's past relevant work as an auto inspector, factory laborer, home health aide and preacher did not require the performance of work-related activities precluded by the limitations described. (Id. (citing 20 C.F.R. 404.1565)) The ALJ determined that the impairments established in this case do not prevent Foster from performing this past relevant work.  (Id.)  Finally, the ALJ concluded that Foster had not been under a disability, as defined in the Social Security Act, at any time through the date of the decision.  (Tr. 24.)

Foster appeals contending that the ALJ erred in determining Foster's RFC because the ALJ did not rely on any medical evidence, failed to consider the medical severity of Foster's impairments, failed to develop the record, and improperly rejected Foster's testimony.  In addition, Foster claims that the ALJ erred in determining that Foster could perform his past work.  The Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

### III.   Administrative Record

The following is a summary of relevant evidence before the ALJ.

#### A.   Hearing Testimony

##### 1.   Foster's Testimony

Foster testified as follows.  Foster went to school through tenth grade but did not obtain his GED.  (Tr. 32.)   Foster attended truck driving school and obtained his CDL license approximately 12 years ago.  (Tr. 32.)  Prior to his alleged disability onset date of January 1, 2008, Foster had been preaching for approximately 13 years.  Id.  At the time of his social security hearing, he was still preaching sermons at the New Life Church on Sunday mornings for 30 minutes to an hour.  (Tr. 32-33.)  Prior to January 2008, Foster was doing three services a

week, but now he only does one morning a week.  (Tr. 33.)  Foster cut back on services because attendance got low and he was not able to deliver the sermons some weeks because of his nervous condition.  (Id.)  Foster testified that he used to be more active in his preaching.   He used to preach in a jail ministry; he evangelized.  (Id.)  He used to mow the yard of the church in a riding lawn mower, but he more recently had to get someone to do that.  (Id.)  He said he is not able to do the job of a preacher because he cannot visit sick people in hospitals or in nursing homes.  (Id.)  Instead, Foster can only call people over the phone.  (Tr. 33-34.)

Foster claims that he cannot work because of his constant, extreme pain.  (Tr. 34.)  Foster has bulged discs and arthritis.  He also has a nerve issue that his causing his left hand to lose muscle.  Foster claims that he needs to have a neck surgery but he cannot afford it.  (Id.)  He states that his right hand is also starting to lose muscle strength.  (Id.)

Foster testified that the pain in his neck is constant.  (Tr. 34.)  Foster said that he can reach out in front of himself and he can reach up over his head without aggravating this pain.  (Tr. 34-35.)   Foster testified that he can "do okay" pushing things if it is "not heavy."  (Tr. 35.)  Foster said he cannot push a grocery cart.  (Id.)

Foster testified that also he has pain in his low back.  (Tr. 35.)  He also suffers from lumbar spine strain that causes his "right muscle" to remain swollen and makes his body crooked.  (Id.)  He was in a 4-wheeler accident when he was 16 but the doctors cannot otherwise find the cause of this problem.  (Id.)    He said the pain in his back is constant but becomes exacerbated by standing or sitting for a long time without moving.  (Tr. 35-36.)  He can sit for less than 30 minutes before his back begins to hurt.  (Tr. 36.)  He can only stand for about five minutes before he starts breathing heavy and sweating.  (Id.)  He sometimes gets sick to his stomach because the pain in his lower back is so bad.  (Id.)

Foster also has a lot of pain in his knees and hips. (Tr. 36.) The pain in his knees started within the last year. (Id.) He can stand long enough to make a sandwich and he gets too out of breath to use stairs. (Tr. 36-37.) He has seven or nine steps at his house and he finds it difficult get from the house to the car. (Tr. 37.) Foster has nerve damage to his feet, or radiculopathy. (Id.) He had red spots on his legs from blood vessels popping. (Tr. 37-38.)

Foster has been trying to lose weight. (Tr. 38.) Foster weighs 401 pounds. (Id.)

Foster has had problems with anxiety and depression for 20 years. (Tr. 39.) His anxiety limits his ability to remember things, he gets short tempered, and it makes him want to run away. (Tr. 39-40.) He has been having major anxiety attacks since December. (Tr. 40.) Foster does not sleep well at night. (Id.)

Foster lives in a house with his wife and four sons. (Tr. 41.) Foster's wife is the manager of a fast food restaurant and provides the household income. (Tr. 43.) Foster cannot play ball with his sons. (Tr. 41.) He cannot work on cars. (Id.)

Foster uses a computer at his home and does not have difficulty with that, other than he cannot type with his left hand. (Tr. 41.)

Foster testified that he watches television at home but usually cannot finish a program due to lack of interest. (Tr. 42.)

Foster's medications make him sleepy and weak. (Tr. 43.) His doctor gave him some Neurotonin for his nerve pain. (Id.) The doctor increased his anxiety medication. (Id.)

**B.     Medical Records**

Foster's relevant medical records are summarized as follows:

From January 4, 2005 through December 31, 2007, Foster obtained care from Bloomfield Family Clinic where he was diagnosed with and treated for morbid obesity,

hypertriglyceridemia, hyper cholesterolemia, anxiety, dyslipidemia, elevator liver enzymes, high

blood pressure, chronic migraine headache, obstructive sleep apnea, chronic pain (secondary to

arthritis), generalized musculoskeletal aches and pains (especially in the lower extremities,

secondary to excessive weight), right hip pain, dyssomnia secondary to pain and mood disorder

and GERD. (Tr. at 435-53.)

From January 11, 2006 through August 27, 2010, Foster obtained care from Family

Medical Care. He was diagnosed and treated with neck pain, chronic back pain likely related to

obesity, shoulder pain, muscle spasms, morbid obesity, chronic anxiety, obstructive sleep apnea,

and GERD. (Tr. at 269-79.)

From February 12, 2007 through March 18, 2008, Foster received treatment from

Advanced Pain Center. (Tr. at 337-46, 354-357, 376-433.) Foster was diagnosed with migraines

and intervertebral disc disorders. (Id.)

On December 11, 2007, Foster attended a mental health clinic at Bootheel Counseling

Services. (Tr. 348-52.) Foster reported that his main problem was "anxiety." (Tr. 348.) The

clinical therapist diagnosed Foster with generalized anxiety disorder, moderate and depressive

disorder, moderate. (Tr. 350.) Foster was assigned a GAF score of 65. (Tr. 350.)[1] Foster

attended only one counseling session. (Tr. 351-52.)

On August 29-30, 2010, Foster sought emergency treatment at the Southeast Medical

Hospital. (Tr. 243-255.) Foster was diagnosed with atypical chest pain, hypertension,

---

[1] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein
an examiner is to "[c]onsider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness"; it does "not include impairment in functioning
due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental
Disorders (DSM-IV), 32 (4th ed. 1994). A GAF score of 61-70 indicates "[s]ome mild
symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational,
or school functioning (e.g., occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal relationships." DSM-IV 32

hyperlipidemia, anxiety, depression, lumbar radiculopathy, morbid obesity, and leaky heart valve. (Tr. 244, 248.) All tests were negative for cardiovascular disease. (Tr. 20, 243-44, 247-50, 252-54.) A CT scan of Foster's brain did not demonstrate any irregularities, after he complained of headaches. (Tr. 20, 248, 254.)

From September 15, 2010 through December 21, 2011, Foster received care from Cross Trails Medical Center. (Tr. 295-331.) Walter Adam, M.D. diagnosed and treated Foster for obesity, chronic neck and lower back pain, depression, anxiety, paresthesia for the bilateral upper extremities to the point of muscle wasting and atrophy, cervical radiculopathy, chest pain, and bilateral knee pain. (Tr. at 298, 303, 305, 308, 311, 324, 330.) The records generally reveal that Foster's medications controlled his symptoms of anxiety and depression. (Tr. 296, 303, 310, 317, 327, 330-31.) A letter dated September 27, 2011, describes left hand muscle wasting but there were no further complaints of this condition. (Tr. 305.) Dr. Walter Adam diagnosed Foster's back pain as lumbago on November 28, 2011. (Tr. 296.)

On October 8, 2010, non-examining, consultative physician James Morgan, Ph.D., reviewed Foster's medical records. (Tr. 256-67.) Dr. Morgan found that Foster's impairments were not severe. (Tr. 256.) He determined that Foster suffered from an affective disorder and an anxiety-related disorder. (Id.) Dr. Morgan determined that Foster suffered from depression and anxiety, which were non-severe. (Tr. 259-60, 266.) Dr. Morgan stated that Foster was only mildly limited in maintaining social functions and was not otherwise limited. (Tr. 264.) Dr. Morgan noted that Foster had no history of hospitalization or specialized outpatient care for mental impairments. (Tr. 266.) Dr. Morgan stated that Foster said that his depression and anxiety were not the reasons that he was unable to work and his function reports do not indicate severe limitations. (Id.)

On August 12, 2011, Foster underwent a CT scan of his cervical spine at Southeast Medical Hospital. (Tr. 290-91.) The CT scan revealed significant image degradation at the C5-C6, C6-C6 and C7-T1; posterior disc bulging at C5-C6, but there was believed to be adequate space remaining within the spinal canal and both intervertebral foramen; focal spur projecting from the midline to the right of the midline off the upper aspect of C6, which may be impinging slightly upon the adjacent thecal sac; at C6-C7 there was a moderate degree of broad-based disc bulging, if not disc herniation and associated spinal stenosis; there was possible moderate degree of disc bulging at C7-T1 with image degradation and possible spinal stenosis. (Id.)

On November 23, 2011, Foster was seen at Southeast Missouri Hospital for a follow-up appointment. (Tr. 285.) The physician noted that Foster suffered from 5 degrees levoscoliosis mid lumbar spine; mild 10% anterior wedging of lower thoracic spine, three contiguous levels; but the lumbosacral spine was otherwise within normal limits. (Tr. 287.)

On January 4, 2012, Ben Lanpher, Ph.D., performed a psychological evaluation of Foster at the request of the Stoddard County Family Support Division for the purpose of assessing his need for medical benefits. (Tr. 333-36.) Foster's medications were Fluoxetine, Clonazepam, Cymbalta, Methocarbarnol, Phentermine, Hydrocodone-Acetaminope, and Prozac. (Tr. 333.) Dr. Lanpher diagnosed Foster with major depressive disorder, recurrent, severe without psychotic features, generalized anxiety disorder, panic disorder with agoraphobia, and a GAF of 48. (Tr. 335.)[2] Based upon his evaluation, Dr. Lanpher discerned that Foster was moderately impaired in his ability to understand and remember instructions and sustain concentration. (Tr. 336.) He also determined that Foster was moderately to markedly impaired in his ability to interact socially, and adapt to his environment. (Id.)

---

[2] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV 32.

On April 27, 2012, Foster had a MRI of the lumbar spine at St. Francis Medical Center. (Tr. 463.)[3] The MRI noted that there was diffuse congenital narrowing of the central canal and a shortening of the pedicles. (Id.) There was no central canal stenosis with the lumbar spine. (Id.) There was mild central stenosis seen at the lower thoracic spine at the T11-T12 level secondary to disc bulge with the thecal sac reduced to approximately 9-10 mm AP. (Id.) There was no spondylolisthesis.[4] (Id.)

On December 31, 2012, Foster had a MRI of the cervical spine at St. Francis Medical Center. (Tr. 461.) The MRI revealed that Foster had mild to moderate C6-C7 central spinal canal stenosis secondary to a broad-based central disc protrusion with minor left hemi cord flattening; mild C5-6 central spinal canal stenosis secondary to a disc/osteophyte complex eccentric right with minor right hemi cord flattening, mild C5-6 central spinal canal stenosis; no overt foraminal stenosis; and mild multilevel facet hypertrophy. (Tr. 461.) On December 31, 2012, Foster had a MRI of the thoracic spine at St. Francis Medical Center. (Tr. 462.) The MRI revealed that Foster had broad-based disc/osteophyte complex at T11-T12 that causes minor cord flattening and mild central canal stenosis; disc herniation at T5-6, T6-7, and T8-9 that causes cord deformity; no associated central spinal canal stenosis; and minor chronic anterior wedge deformity of T8, chronic mid and lower thoracic Schmorl's nodes, and not acute thoracic vertebral compression fracture. (Tr. 462.)

---

[3] On January 2, 2013, after the denial of his disability claim, Foster filed a motion to add new and material evidence that included his records from St. Francis Medical Center. (Tr. 460-63.) This was granted.

[4] Spondylolisthesis is a condition in which one bone in your back (vertebra) slides forward over the bone below it. It most often occurs in the lower spine (lumbosacral area). In some cases, this may lead to your spinal cord or nerve roots being squeezed. This can cause back pain and numbness or weakness in one or both legs. In rare cases, it can also lead to losing control over your bladder or bowels. See http://www.webmd.com/arthritis/tc/spondylolisthesis-topic-overview.

## IV.    Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ."  Id.  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  Id.

Fourth, the impairment must prevent claimant from doing past relevant work.[5]  20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his RFC. Steed v. Astrue, 524 F.3d 872, 874 n.3 (8th Cir. 2008); see also Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  Id.; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  Id.; see also 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  Goff, 421 F.3d at 790; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  The Commissioner must prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.  "The ultimate burden of persuasion to prove

---

[5] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." Mueller v. Astrue, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

disability, however, remains with the claimant."  Id.; see also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole.  See Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002); see also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence.  Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984).  In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or  deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision."  Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)).  Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently.  Krogmeier, 294 F.3d at 1022.

## V.    Discussion

Foster asserts two errors on appeal.  First, Foster claims that the ALJ erred in determining his RFC.  Specifically, Foster claims that the ALJ improperly evaluated Foster's credibility, improperly determined whether Foster's impairments were severe and failed to adequately develop the record regarding Foster's impairments. Second, Foster contends that the ALJ erred

in determining that Foster could perform his past work. The Commissioner contends that the ALJ properly evaluated Foster's credibility, determined his RFC and severe impairments, and developed the record. In addition, the Commissioner claims that the ALJ properly determined that Foster could perform his past relevant work.

### A.     Residual Functional Capacity

The ALJ found that Foster's physical impairments were as follows:

> The claimant does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently occurring muscle spasms, obvious or consistently reproducible neurological deficits (motor, sensory, or reflex loss) or other signs of nerve root impingement, significantly abnormal x-rays or other diagnostic tests, positive straight leg raising, persistent inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction. The medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment. The claimant requires no cane, crutches, or other assistive device to stand or walk.

(Tr. 21-22.) Based upon these impairments, the ALJ determined that Foster had the RFC to perform the physical and nonexertional requirements of work except probably for lifting and carrying more than 30-40 pounds frequently. (Tr. 24.)

The ALJ found that Foster's mental impairments were as follows:

> The claimant's basic abilities to think, understand, communicate, concentrate, get along with other people, make normal judgments and decisions, adjust to work setting changes, and handle normal work stress have never been significantly impaired on any documented long-term basis. There have been no documented serious deterioration in his personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, or behavior patterns over any extended periods of time. The claimant has never been described as chronically suicidal or psychotic at all. He has required no psychiatric hospitalization or similar drastic intervention. The claimant has no long-term or sustained course of mental health treatment from a psychiatrist, psychologist or other mental health care professional, as might be expected of someone with a genuinely severe chronic mental impairment.

(Tr. 22.)  Accordingly, the ALJ determined that there were "no credible, medically-established mental or other nonexertional limitations."  (Tr. 24.)

Foster argues that the ALJ failed to rely on any medical evidence to support his RFC determination, the ALJ substituted his own opinion for medical evidence and that the evidence supports the presence of disabling limitations.  In addition, Foster claims that the ALJ did not follow the Social Security Rulings that require that an ALJ specify what medical evidence he relied on in forming the RFC and how that evidence supported the limitations included in the RFC.  (ECF No. 11 at 8 citing Social Security Ruling ("SSR") 96-8 ("The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms.")).  Foster also asserts that the ALJ failed to elicit a medical opinion to determine Foster's RFC, which requires reversal.

RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §§ 404.1545, 416.945. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis. SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)). "Although the ALJ bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence, a claimant's [RFC] is a medical question. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir.2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001)). Therefore, an ALJ is "required to consider at least some supporting

evidence from a [medical] professional." Lauer, 245 F.3d at 704. An RFC determination will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir.2006).

The Court finds that the ALJ's finding that Foster's mental conditions were well-controlled and that he had no mental restrictions is sufficiently supported in the record. With respect to Foster's mental impairments, the ALJ held that Foster's anxiety and depression were adequately controlled by medication, and this is supported in the record. (Tr. 24, 438, 296.) On December 22, 2007, Foster was assigned a GAF 65, which indicates only mild difficulty with social and occupational functioning. (Tr. 19, 350) The ALJ noted that Foster's mental functioning was quite stable according to records from Cross Trails and from Nurse Petigo and others. (Tr. 22.) For example, on October 25 and December 20, 2011, Dr. Green at Cross Trails Medical Center reported that Foster was alert and cooperative, had normal mood and affect, no depression anxiety or agitation, normal attention span and concentration, and denied suicidal or homicidal thoughts. (Tr. 315, 320.) The ALJ acknowledged that Dr. Lanpher performed an examination on January 4, 2012 and found that Foster had severe mental restrictions, but the ALJ discounted that opinion as an inaccurate one-time assessment. (Tr. 22.) The ALJ noted that there has never been any documented long-term determination that Foster is restricted in his "basic abilities to think, understand, communicate, concentrate, get along with other people, make normal judgments and decisions, adjust to routine work setting changes, and handle normal work stress[.]" (Tr. 22.) Likewise, the ALJ stated that there had been "no documented serious deterioration in his personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, or behavior patterns over any extended period of time." (Id.). The ALJ recognized that Foster had

never been described as suicidal or psychotic.  (Id.)  The ALJ explained that Foster never had been hospitalized or had any other similar treatment for his mental health.  (Id.)  In fact, the ALJ noted that Foster had never received any long-term sustained course of mental health treatment from a psychiatrist, psychologist, or other mental health professional.  (Id.)  Further, the ALJ commented that Foster did not appear to have any obvious signs of depression, anxiety, memory loss, or other mental disturbance at the hearing.  (Id.)  Thus, the ALJ found that Foster had not presented any credible, medically-established mental or mood disorder that would prevent him from doing any ordinary jobs, including his prior employment.  (Id.)  Further, the ALJ stated that even if Foster were "severely" depressed since December 2011, there was no reason to believe that level of depression/anxiety was not treatable or that it would be at an incapacitating level for the continuous period of twelve months or longer that is required for a finding of disability under the Social Security Act.  (Id.)

The ALJ also concluded Foster's failure to seek regular, frequent treatment undermined his credibility that he suffers from a severe impairment. Likewise, the evidence indicated that Foster sought limited treatment and that medication usage was effective in controlling severe symptoms.  Finally, the ALJ noted that Foster had not suffered any severe breakdowns or episodes of decomposition, which also indicate that his condition is not severe.  The ALJ concluded Foster's impairments had and could be controlled by medication or treatment, which precluded a finding he suffered from a disability.  Thus, notwithstanding Foster's one GAF score of 48, the record supports the ALJ's determination that he does not suffer from a severe mental impairment.

With respect to physical restrictions, however, the Court finds that the record does not substantially support the RFC assigned by the ALJ.  The ALJ determined that Foster's physical

activities were not restricted, or were restricted only by his choice. (Tr. 22.) The ALJ ultimately concluded that Foster had the RFC to perform the physical and nonexertional requirements of work except "probably for lifting or carrying more than 30-40 pounds frequently." (Tr. 24.) In support of this finding, the ALJ noted that Foster was hospitalized for only one day in August 2010 for chest pain and all tests were negative for cardiovascular disease. (Tr. 20.) Likewise, a CT scan of Foster's brain was negative for any abnormalities. (Tr. 20.) The ALJ noted that on September 27, 2011, Foster had left hand muscle wasting according to Dr. Adam, but that complaint did not continue in the medical records. (Tr. 20.) The ALJ referenced that on November 28, 2011, Dr. Adam diagnosed Foster's back pain as mere lumbago. (Tr. 20). The ALJ determined that Foster had, at worst, some moderate disorder of the cervical spine. (Tr. 21.) The ALJ noted that there was no documented evidence of any specific arthritis affecting the lumbosacral spine, although the ALJ noted that Foster undoubtedly suffered more pain than a man of normal size. (Id.) The ALJ stated that there was no evidence of any muscle wasting disease or peripheral neuropathy in any upper or lower extremity. (Id.) The ALJ discerned that Foster's headaches had decreased significantly since his sleep apnea was diagnosed and treated in 2005. (Tr. 21.) Likewise, the ALJ concluded that Foster's sleep apnea, hypertension, and hyperlipidemia all were well controlled by medication. (Id.) The ALJ stated that Foster did not have any diagnosed heart or lung disease. (Id.) The ALJ determined that none of Foster's physical impairments resulted in significant long-term limitations or complications. (Id.)

The ALJ also acknowledged that Foster is very obese. (Tr. 21.) Although obesity is a medically-determined impairment that must be fairly evaluated along with all other impairments, it is not a separate impairment that can qualify one for disability under its own Appendix 1 listing. See Social Security Ruling 02-01p ("There is no specific level of weight or BMI that

equates with a "severe" or a "not severe" impairment.")  The ALJ nevertheless held that there was no credible evidence that "the obesity, although contributing to some diminution in ordinary mobility and stamina, reduced Foster's overall functional abilities, either by itself or in combination with other medically-established impairments in this case," any further than the RFC the ALJ already determined.  (Tr. 21.)

The ALJ asserted that no doctor who has treated or examined Foster has stated that he is disabled or totally or seriously incapacitated.  (Tr. 21.)  The ALJ asserted that "[n]o doctor has placed any specific long-term limitations on the claimant's abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities."  (Id.)

The ALJ also based his determination on Foster's lack of any surgeries or inpatient hospitalizations in recent years.  (Tr. 21.)  Foster also had not attended a pain management clinic since March 2008.  (Id.)

Although the ALJ stated that no doctor ever placed any restrictions on Foster, Foster points out that he was given the restrictions of limiting lifting (floor to waist) to 15-20 pounds, no squatting, kneeling, or climbing, and avoid twisting activities which may cause knee to lock or give way, and no frequent lifting over 15-20 pounds by Dr. Abdul N. Naushad. (Tr. 379-80.) In addition, Dr. Adams instructed Foster to avoid activities that increase discomfort.  (Tr. 330.) Thus, although the ALJ acknowledged and discounted the restrictions place on Foster by Dr. Lanpher,[6] the Court finds that the ALJ did not account for or address the restrictions placed on Foster by Dr. Naushad and Dr. Adams.  In the absence of alternative medical evidence, the Court finds that the physical limitations the ALJ described for Foster's RFC did not account for all of

_____

[6] Dr. Lanpher, who performed a psychological evaluation of Foster, discerned that Foster was moderately impaired in his ability to understand and remember instructions and his ability to sustain concentration, and moderately to markedly impaired in his ability to interact socially and adapt to his environment.  (Tr. 336.)

his medically-diagnosed limitations. Instead, the Court finds that the ALJ impermissibly drew "upon his own inferences from medical reports."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Landess v. Weinberger, 490 F.2d 1187, 1189 (8th Cir.1974); Willem v. Richardson, 490 F.2d 1247, 1248–49 n. 3 (8th Cir.1974).   There is no other evidence in the record that specifically evaluates Foster's physical functional capacity to perform work related activities on a regular and continuing basis. The evidence in the record shows that Foster is obese and has neck and back problems. Because these limitations were not entirely accounted for by the ALJ in determining his RFC, the Court cannot find that the ALJ's decision as it relates to Foster's RFC is supported by substantial evidence in the record as a whole.   The Court remands this action to allow the ALJ to consider and analyze all of the medical evidence to determine Foster's RFC.

In addition, the Court finds that the ALJ did not properly determine which of Plaintiff's impairments, if any, were severe.   While the government describes this as merely an "arguable deficiency in opinion-writing technique" (ECF No. 14 at 9), the Court does not believe that the ALJ has made a sufficient record regarding whether Foster's impairments are severe in this case. See SSR 85-28, 96-3p ("The evaluation of whether an impairment(s) is 'severe' that is done at step 2 of the applicable sequential evaluation process set out in 20 CFR 404.1520, 416.920, or 416.924 requires an assessment of the functionally limiting effects of an impairment(s) on an individual's ability to do basic work activities[.]").   The ALJ never makes any specific findings regarding whether Foster's impairments are severe, other than his conclusory statement that his obesity, degenerative disc disease of the cervical spine, hypertension, hyperlipidemia and anxiety and depression do not solely or in combination meet or equal the severity requirements of any impairments listed in Appendix 1, Subpart P, Regulations No. 4.   (Tr. 24.)   This is insufficient.

The ALJ was required to evaluate how these impairments (either alone or in combination) limited Foster's ability to do basic work activities.

Finally and along the same lines, the Court finds that the ALJ failed to properly develop the record in this case. As stated, the ALJ found that Foster had the RFC "to perform the physical exertional and nonexertional requirements of work, except probably for lifting or carrying more than 30-40 pounds frequently." The ALJ here identified no opinion from physicians, non-treating or non-examining, that he used to develop Foster's supposed RFC. "Medical testimony is relevant in determining precisely what claimant's physical impediments are, but it is not conclusive as to the ultimate question concerning whether the claimant's injuries are so severe that he is prevented from doing productive work." Nelson v. Sullivan, 946 F.2d 1314, 1316–17 (8th Cir.1991). "An ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)(citing 20 C.F.R. § 416.927(c)(3)). "But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber, 22 F.3d at 189 (citing 20 C.F.R. § 416.927(c)(4)). The ALJ does not identify any medical evidence in the record to support the RFC of "probably … [no] lifting or carrying more than 30-40 pounds frequently." This action is remanded to the ALJ to develop the record and provide some medical support for Foster's RFC.

**B.    Past Relevant Work**

"Step four requires the ALJ to consider whether the claimant retains the RFC to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work." Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009)(citing Steed v. Astrue, 524 F.3d 872, 875, n.3 (8th Cir.2008)). "If the ALJ determines the claimant cannot

resume her prior occupation, the burden shifts to the Commissioner at step five to show the claimant is capable of performing other work." Id. "[A]n ALJ has an obligation to 'fully investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant work.'" Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991)(citing Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 866 (8th Cir.1989)).

The Eighth Circuit has outlined what is analysis is required to determine if a claimant can perform his past relevant work:

> An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity. The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work. Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks. See [Kirby v. Sullivan, 923 F.2d 1323, 1326-24 (8th Cir. 1991)]. A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his past work.

Groeper v. Sullivan, 932 F.2d 1234, 1238-39 (8th Cir. 1991).

Here, the ALJ did not perform any sort of analysis outlining the job requirements for Foster's past relevant work. The only evidence in the record regarding the tasks required by Foster's former jobs is a vocational report Foster completed for the SSA when he applied for disability benefits. Although the ALJ referred generally to the job requirements as provided by Plaintiff in his work history report (Tr. 20, 154-65), the ALJ performed only a conclusory determination that Foster could perform this past relevant work. Although the government

claims that the ALJ "compared Plaintiff's job description to his RFC and properly found that these jobs did not require work activities precluded by Plaintiff's RFC" (ECF No. 14 at 11), the record before the Court indicates that the ALJ came only to the perfunctory conclusion that Foster could perform his past work as a pastor, home health aide, laborer, and auto inspector. Accordingly, the Court remands this action to the ALJ to determine whether Foster retains the RFC to perform his past relevant work, particularly in light of the new records provided by Foster after his hearing.  (Tr. 5, 461-63.); 20 C.F.R. §404.989(a)(1).

**VI.     Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision was not based on substantial evidence in the record as a whole and should be reversed and remanded.  Upon remand, the ALJ should re-evaluate Foster's RFC based upon medical evidence, determine which, if any, if Foster's impairments are severe, and more fully develop the record as it relates to Foster's impairments and RFC.  In addition, the ALJ must specifically set forth Foster's limitations, both physical and mental, and determine how those limitations affect whether Foster retains the RFC to perform his past relevant work.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **REVERSED AND REMANDED** to the ALJ for a new determination of Foster's RFC and his ability to perform his past relevant work in accordance with this Memorandum and Order.  A separate Judgment will accompany this Order.

A separate written judgment will be entered on this date in favor of Foster and reversing and remanding this case for further proceedings pursuant to sentence four o f42 U.S.C. §405(g).

Dated this 19th day of March, 2014.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE